EDMOND L. SIEMERS and ADELE W. PELLIGREEN v. ST. LOUIS ELECTRIC TERMINAL RAILWAY COMPANY, Appellant.—155 S. W. (2d) 130.

Division One, April 18, 1941.

Rehearing Denied, July 25, 1941.

Motion to Transfer to Banc Overruled, October 30, 1941.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for appellant.

*Reardon & Lyng* and *J. B. Steiner* for respondents.

686

BRADLEY, C.—Plaintiffs sought to enjoin defendant from constructing an underground railway in Twelfth Street, St. Louis, upon which plaintiffs' lot abutted. By stipulation the cause proceeded as one in condemnation under Sec. 1504 et seq., R. S. 1939, 2 Ann. Stat., sec. 1340 et seq., p. 1533 et seq. Commissioners were appointed and reported; plaintiffs filed exceptions; a jury found for defendant and plaintiffs appealed. The judgment was reversed and the cause remanded. [Siemers et al. v. St. Louis Electric Terminal Ry. Co., 343 Mo. 1201, 125 S. W. (2d) 865.] A second trial resulted in a

verdict for plaintiff for $19,750. On motion for a new trial a *remittitur* of $4500 was made; judgment for $15,250 was entered, defendant appealed, and the cause is here for the second time.

Plaintiffs owned the lot at the southwest corner of Franklin Avenue and Twelfth Street. The lot extended 32 feet east and west on Franklin and 75 feet north and south on Twelfth. Before the construction of the subway there was on the lot a three story brick building with basement. The main building faced north, and extended 30 feet east and west on Franklin, and south on Twelfth about 40 or 45 feet. On the west side of the lot an ell, about 15 feet in width, extended south from the main building to the south line of the lot, and the area east of the ell was a yard. There was a first floor entrance on Franklin and on Twelfth. The second and third floors of the main building and the ell were reached through a gate in the Twelfth Street yard fence and stairways.

The first floor and basement, prior to the subway, were rented for $160 per month. The second floor was rented for $60 and the third for $45 per month. The east wall of the main building brought $150 per year for sign purposes, and the south wall of the ell brought $75 per year for the same purpose. All told, the building, before the construction of the subway, brought an annual rental income of $3405. The building was old; was never occupied after the completion of the subway, but was torn down.

In the former opinion, it was stated (343 Mo. 1201, 125 S. W. (2d) l. c. 867): "A trench was excavated in Twelfth Street and in Franklin Avenue alongside appellants' property. The trench was from 75 to 100 feet at the top—flush with the building line in Twelfth Street— and 40 to 45 feet deep, the sides tapering so that the trench was some 35 or 40 feet wide at the bottom, on which the rails were laid."

Error is assigned on the instructions, given and refused, on the admission and exclusion of evidence, and on an alleged excessive verdict.

Plaintiffs' instruction No. 1 told the jury, if they found for plaintiffs, to assess damages "in such sum as you may find and believe from the evidence will compensate the plaintiffs for the difference, if any, between the market value of the property mentioned in the evidence, immediately before the construction of the subway and the railroad therein along plaintiffs' property, and the market value of said property immediately after the construction of said subway and railroad."

The instruction then enumerated the separate elements of damage which might be considered by the jury in arriving at the damages, if they found for plaintiffs. After enumerating the elements to be considered, the instruction concluded: "Upon your consideration of these elements, you should find and determine what sum of money will fairly and reasonably compensate the plaintiffs for the difference in the market value of their property directly and proximately caused

by the construction of said subway and railroad therein and you should award plaintiffs such amount of damages, less however, such special benefits, if any, as accrue to the property of the plaintiffs. But, before you can deduct any special benefits from the damages, you must find and believe from the evidence that plaintiffs' property is directly made accessible to the defendant's railroad and switching facilities, if any, located in the subway in Twelfth Street.''.

Of instruction No. 1 defendant says: (1) That it makes unwarranted assumptions; ▆▆▆ (2) that it erroneously permitted recovery for permanent injury to the building, although such damage claim was withdrawn when the matter was before the commissioners; (3) that there was no evidence to support submission of loss of lateral support; (4) that it did not restrict damages, for interference with access to the building, to such damages, if any, that were different in character to that sustained by all other abutting owners; and (5) that the instruction is a comment on the evidence and is a roving commission.

. Defendant says that the instruction ''assumes that any loss of rents due to loss of tenants was caused by the interference with the ingress and egress by the defendant; assumes that the tenant would have stayed for the same rent, or that other tenants would have paid the same rent, and assumes that the rent paid by the tenants who vacated in 1930 was the reasonable rental for the property after the vacation by the tenants.''

The instruction told the jury that in determining damages that they might ''take into consideration . . . the extent, if any, of the loss of rents sustained by plaintiffs due to the loss of tenants, if you so find from the evidence.'' It is quite plain that such direction did not assume that plaintiffs lost any rents. What defendant means, we think, is that there was no substantial evidence to support a finding for loss of rents, and to this we agree.

The first floor had been rented at $160 per month, under a five year contract, to the Industrial Plumbers Supply Company. The lease expired, according to plaintiff Siemers, in June or July, 1930, and Siemers, who is an attorney, testified that the lease was not renewed because ''we wouldn't renew his lease under the conditions he wanted. He wanted the ability to carry on his buisness.'' Just what is meant by ''the ability to carry on his business'' is not clear. Siemers also testified that all the tenants moved out in June or July, 1930; that at that time the subway work, approaching from the north, had reached the north side of Franklin. ''Q. Well, what was the kind of work they were doing there? A. They were doing a great deal of excavating. They had enormous shovels, and they were digging a trench about a hundred feet wide, going down to a depth of approximately forty or forty-five feet.''

Plaintiffs introduced in evidence the permit issued by the Board of

Public Service to defendant to construct the subway, and this permit was dated September 23, 1930. On cross-examination Siemers said that he was "not quite certain" when the tenants moved out; that it might have been August or September, 1930. If the permit was not issued until September 23, 1930, Siemers was mistaken about the subway work reaching the north side of Franklin in June or July, 1930, unless the defendant had proceeded with the construction before it had permission from the city, and there is no such claim. While Siemers testified that the subway, approaching from the north, reached the north side of Franklin by June or July, 1930, he also testified: "Q. And you say, at that time the project had gotten to the north side of Franklin Avenue? A. Yes; and well known to everybody. Q. Now, then, do you know of your own knowledge when it was that they commenced excavating in front of the property on Franklin Avenue? A. On Franklin Avenue? Q. When they first commenced digging holes there. A. About June the 10th, I would say, or just about that time, on the Twelfth Street side, 1931. Q. 1931, you say, Mr. Siemers? A. Yes, sir. Q. All right. Now, then, do you know in what month in 1931 the street was closed there? A. Well, about the same time." Reminded that on the former trial he had been asked, "When did your property cease to be occupied?," and had answered, "In October, 1930," he said, "Approximately that was true."

As to the second and third floor tenants Siemers testified: "We rented the second floor and the third floor to an individual on each floor that ran what I would term light housekeeping rooms there. Q. Well, what was the name of the individual to whom you rented the third and second floors? A. The second floor, I think, was rented to a Mrs. Bracken. I think it was B-r-a-c-k-e-n, I think was the name. Q. Whom was the third floor rented to? A. The third floor was rented to—I am not certain of this name. I think it was Palmer. Q. Well, how long had the second and third floor occupants moved out before the plumbing company moved out on the first floor? A. I don't know as to dates when they moved out, whether it was slightly before or slightly afterwards. Q. And you haven't brought any of your records here that would show it? A. No, sir."

William W. Butts, plaintiffs' witness, was in the real estate business for 32 years and familiar with plaintiffs' property; made a special study of it "for the purpose of appraising it here in court." He valued the lot, excluding the building, at $1200 per front foot on Franklin (32 feet), a total of $38,000. Speaking of the building, he said: "The building that is on there is what we term more as a tax payer. It has a value for revenue purposes, but anyone buying it would buy it for the ground value. The building was old and pretty well worn out. It added a value of, I will say, three thousand dollars to the ground."

Then Butts was asked: "What, in your opinion, is the depreciation or damage to this property by reason of the loss of rentals, assuming that the tenants moved out, and they were out for a period of eighteen or twenty months during the period of construction near this property in Franklin Avenue and in Twelfth Street adjacent thereto?" Objection was made "on the ground that there is no qualification as to the percentage of rentability in that neighborhood. There is no showing that they were other than month to month tenants for a certain period, and, in that situation, it calls for a conclusion, as the question is now framed, and doesn't tend to establish any measure for damages." The objection was overruled, and the witness answered that the loss in revenue would be about $5200.

There was no evidence that "the period of construction," by plaintiffs' property, was "eighteen or twenty months." As stated, Siemers testified that defendant "commenced digging holes" in Twelfth Street, adjacent to the property, June 10, 1931, and he also testified: "Q. When was it, Mr. Siemers, that the street and the sidewalk were completed and finished so that your property was just as accessible, so far as the surface was concerned, as it was before the project started? A. Approximately June, 1932. . . . Q. Well, I mean when was it (the building) just as accessible as it was before the project, having in mind with respect to Twelfth Street and Franklin Avenue there? . . . A. I would say some time in April (1932) as to the availability of my being able to get to the property myself, personally."

George W. Foster, an engineer, and superintendent for the contractor for the construction of the relief sewer "and certain other work on this job that is under discussion," testified that the work was finished about the first of the year 1932.

J. H. Farish, a witness for defendant, testified that he had been in the real estate business for 46 years; handled the property in the vicinity of Franklin and Twelfth, and was handling the property at the northwest corner of Franklin and Twelfth at the time the subway was being built and had been handling it for about twenty years; that he lost no ground floor tenants during the construction of the subway; that plaintiffs' building had been a residence, but "had been changed into a store and rooms above;" that the reasonable rental value of the ground floor was about $100 or $125 per month; that he had no opinion as to the second and third floors. Q. Well, is it or is it not a fact that in your opinion second and third floors of buildings on the corner are very hard to rent? A. Judging from my experience across the street, I would say yes, they are pretty hard to rent. Q. In fact, have you any tenants at all on the second and third floors across the street? A. We always had difficulty in keeping tenants there. . . . Q. Now I will ask you, in a building of this type that this Siemers building was, whether or not, in your opinion,

in 1930 a tenant moving out, if it was possible to get other tenants in without making improvements and modernizing the store? A. To get other tenants in there you would have to improve it."

Plaintiffs' counsel, in urging the competency of evidence to which objection was made, stated that "those people (the tenants) moved out in 1930, because they couldn't sleep; they couldn't conduct a business on account of the interference north of Franklin Avenue." There is no *evidence* as to why the tenants moved out except as to the first floor tenant and that reason is stated, supra. To permit recovery ▮▮▮ for loss of rents on the theory that the tenants moved out because of operations carried on by defendant would be to permit recovery without evidentiary support. It may have been that the tenants did vacate because of such operations, but, if so, the burden was on plaintiffs to so show. There was no substantial evidence to support submission, in instruction No. 1, of loss of rents. "An instruction must be sustained by the evidence and may not invite a verdict based on conjecture or speculation." [State ex rel. Banks v. Hostetter et al., 344 Mo. 155, 125 S. W. (2d) 835, 1. c. 838; Gately v. St. Louis-S. F. Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54, 1. c. 62.]

Did plaintiffs waive their right to claim recovery for damages for permanent injury to the building by withdrawing such element of damage when the matter was before the commissioners? The report of the commissioners contained this: "The commissioners have no evidence before them as to any permanent damage to the present building on said site and the claim was withdrawn by plaintiffs' counsel."

To support the waiver claim, defendants cite Ryan v. Metropolitan Life Ins. Co. (Mo. App.), 30 S. W. (2d) 190, and Lindner v. Cape Brewery & Ice Co., 131 Mo. App. 680, 111 S. W. 600. The waiver in the Ryan case concerned the competency of a physician to testify as to information acquired in the treatment of a patient, and also concerned the competency of a hospital record of the patient. On a previous trial such evidence had been admitted without objection, and at a subsequent trial an objection to such evidence on the ground of privilege was overruled on the theory of waiver and such ruling was sustained on appeal. The Lindner case was an action by a discharged employee to recover, for the remaining period of the contract, the amount specified therein. We do not think that these cases support defendant's waiver contention and we find no case to support.

There is no provision in the statute for the parties to appear before the commissioners. "A landowner whose property is sought to be condemned may sit idly by, file no pleadings, and permit the suit to progress until the commissioners make their award. If he be satisfied with the award, he has the right to accept it and go his way without any expense whatsoever. If he is not satisfied with the award, he has the right to file exceptions and demand a jury." [State ex rel.

Union Electric Light & Power Co. v. Bruce, 334 Mo. 312, 66 S. W. (2d) 847, l. c. 849.] The case of School District of Kansas City v. Phoenix Land & Improvement Co., 297 Mo. 332, 249 S. W. 51, was a condemnation case. The court said (249 S. W. l. c. 53) : "When the court awarded defendant a trial by jury as to the damages sustained by it, the report of the commissioners became *functus officio*, and the cause then stood as though no commissioners had ever been appointed." There is no merit, as we see it, in the claim of waiver.

▮ Was there evidence to justify submission of loss of lateral support? The instruction told the jury that they might consider "the extent, if any, to which plaintiffs' building was injured by the removal of . . . lateral support," if such fact was found. Carl Koerner, an engineer, and plaintiffs' witness, testified: "Now, then, in connection with making your observations with respect to putting in a foundation on this Siemers property, would the location of this berm and the location of this slope immediately adjacent to it have any bearing on your calculations? A. Why, it is O. K. for a small building, but for a very large and heavy building, why, you would have to have caissons. . . . Q. I am talking about the presence of this slope, would such presence of this slope have any bearing on whether or not you would make any different calculations as to the cost of the installation of a foundation upon the Siemers property? A. No. I would leave it just this way. Q. I am not asking you to change it. I mean what difference does that make with respect to your calculation A. None at all. Q. None at all? A. No. Q. What I am getting at is this. In the event that this berm or this pile of earth, this earth there (indicating on exhibit) were not present there, what would be your determination with respect to the foundation? How far would you have to go? That is what I am trying to get at. A. Well, I would have to go down to the present subway line and then go to rock, with a larger building."

Plaintiffs' witness, Lee Pelligreen, testified: "Would it make any difference to you, as a construction engineer, if you were going [136] to put up a building on Twelfth and Franklin Avenue on this particular property, would the fact that there is a slope such as shown in exhibits K, L and M, would that make any difference to you? A. I wouldn't want to stake my reputation and money in putting a building on that property without going down to rock with that foundation."

Defendant's witness, E. R. Kinsey, an experienced engineer, testified: "Q. Has anything been done there that has in any way removed any lateral support from that ground? A. All the lateral support that that ground gives for carrying building loads is still there. Q. Will you please explain what you mean by that? A. Well, I mean that the excavation that was made is entirely beyond the soil which would be under pressure by reason of any building loads that would be imposed on it in any normal buildings there. Q. Is the excavation

of the subway outside of any pressure that would be exerted by the erection of a building on this property? A. Yes, sir.'' We do not think that it can be fairly said that plaintiffs' evidence is sufficient to justify submission of loss of lateral support.

■ Should instruction No. 1, as to damages for interference with access, have been restricted as claimed? As stated, defendant says that plaintiffs' instruction No. 1 is bad because it did not restrict damages, for interference with access to the building, to such damages, if any, that were different in character to that sustained by all other abutting owners. This complaint is the same as the complaint on the refusal of defendant's instruction H, which follows:

''The court instructs the jury that if you believe and find the interference of access to plaintiffs' property was no different in character than the interference with access of other property owners along the line of the building of the subway and widened street, the plaintiffs cannot recover for any loss on account of such interference, and all such claims are withdrawn from your consideration.''

In such situation as here plaintiffs cannot complain of obstruction in the street, caused by the work, that merely prevents travel along the streets to get to their property, and this because such is common to all abutting owners. [Gorman v. Chicago, Burlington & Quincy R. Co. et al., 255 Mo. 483, 164 S. W. 509; Rude v. The City of St. Louis et al., 93 Mo. 408, 6 S. W. 257; Canman et al. v. The City of St. Louis, 97 Mo. 92, 11 S. W. 60; Heinrich v. The City of St. Louis, 125 Mo. 424, 28 S. W. 626.] Instruction H, however, is broad enough to deny recovery for interference of access, even though access, to plaintiffs' house, from the street in front were entirely prevented, provided it should be that such was the case with all other abutting owners. Such is not the law. In the Gorman case, supra, it is said (255 Mo. 1. c. 491):

''This constitutional provision (private property shall not be taken or damaged, etc.) refers, it will be noted, to the taking and damaging of property and not of any purely personal right. As we have already said, everybody has the personal right to travel along the street. He may exercise it a hundred times each day or once a year and its nature is the same: the exercise of a public right held in trust for him by the State through its constituted legislative agency, which alone has the power to prepare and preserve the street for his use. With this duty he has no authority to interfere. The right protected by the Constitution, because it pertains to his property, is the right of access to the street or free passage between his property and the street, so that he may go upon it to exercise his public right of travel, and when he has done so return to his own grounds (citing cases). While some courts in other jurisdictions have held that the private right of access to the street appurtenant to abutting property includes the right to travel along the street to certain other places within limits that thus far have not been satisfactorily designated, this court has

consistently adhered to the doctrine that the right of access *is the only right appurtenant to private property* which is *not* included within such broad control as has been conferred upon the city of St. Louis by the charter. . . . (Italics ours.)

"An abutting lot owner has the same right to the use of the street that rests in other property owners and the public at large. Besides this, he has the right of access to and from his lot, which right is special to him. It is an easement appurtenant to his real estate abutting on the street. It is private property as much as the lot itself, and cannot be destroyed or impaired for public use, save by the payment of compensation therefor." [Knapp, Stout & Co. v. St. Louis Transfer Ry. Co., 126 Mo. 26, l. c. 35, 28 S. W. 627.]

In 20 C. J., p. 689, sec. 152, it is said: "Any occupation or use of a street or highway which obstructs the same so as to destroy or materially impair the easements of an abutting owner is a taking of, or injury to, private property entitling such owner to compensation."

Defendant has no support for the complaint on the refusal of its instruction H, or for the contention that plaintiffs' instruction No. 1 should have been restricted as claimed, and we so rule.

 Was plaintiffs' instruction No. 1 a comment on the evidence or a roving commission? "It is always proper to advise the jury by instructions what elements (in a condemnation case) they may consider in estimating the damages claimed. Such an instruction does not amount to a comment on the evidence, nor give any part thereof undue prominence. Directing the jury's attention to the elements of damage is a different thing from calling attention to specific facts which tend to prove or disprove such elements." [State ex rel. State Highway Commission v. Haid et al., 332 Mo. 606, 59 S. W. (2d) 1057, l. c. 1060, and cases there cited.] Plaintiffs' instruction was not a comment on the evidence, nor was it a roving commission as claimed. Other complaints are made on instruction No. 1, but on a retrial these can be eliminated.

 Defendant says that plaintiffs' instruction No. 2 is without evidentiary support and is in conflict with instruction No. 1. As stated, instruction No. 1 told the jury what elements of damage might be considered in determining market value. Instruction No. 2 defined market value as follows: "The court instructs the jury that the market value of property means its actual value, that is, the fair value of the property as between one who desires to sell but does not have to sell, and is bought by one who is under no necessity of buying it." Defendant does not challenge the correctness of the definition as such, but says that the definition given is a direct conflict with instruction No. 1 "in that instruction No. 1 tells the jury to take into consideration factors which are not included" in No. 2. We are not able to appreciate the point and counsel cite no authority

and do not explain. Had the *factors* been again set out in No. 2, such would have been repetition.

As pointed out, supra, it seems to be proper, in a condemnation case, to instruct the jury on what elements of damage may be considered. Sec. 7309, R. S. 1939, 8 Ann. Stat., sec. 7158, p. 5820, applicable here, provides: "Damages in this article are hereby defined to be the depreciation in the value of the property that may result from the construction and operation of the proposed railroad." Plaintiff made no effort to prove the *difference* in market value before and after the subway was constructed, or as the statute says *depreciation*. According to defendant's evidence, the market value of plaintiffs' property was enhanced in value by construction of the subway.

Defendant complains on the refusal of its instruction E which follows: "The court instructs the jury that when testimony in the possession of a party to a suit is not produced and no explanation is made for not introducing it, the jury may presume that such testimony, if produced, would be unfavorable to such party." This instruction was aimed at plaintiff Siemers. In the brief defendant says: "Mr. Siemers testified as to the amount of rentals received and that there was a five year lease on the first floor and two agreements for signs. He was indefinite as to the dates on which the first, second and third floors became vacant. He did not produce the lease or make any explanation for failing to produce the lease, and did not produce records showing what rents were collected, or make any explanation for failure to produce them. In these circumstances the jury might presume that had he produced this evidence it would have contradicted his oral testimony, and the defendant was entitled to have the jury so instructed."

It is not necessary to specifically rule the assignment on the refusal of defendant's instruction E, but we might say that if the cause is retried the written lease and records, if available, should be produced or their absence explained.

The assignment on the admission of evidence has reference to the evidence of plaintiffs' witness Butts as to what the rent would have amounted to over the period of 18 or 20 months. As appears, supra, Butts testified that the rent over such period would have amounted to $5200. We ruled, supra, that there was no substantial evidence as to loss of rents, and, in effect, there ruled this assignment.

Complaint is made on the exclusion of the evidence of witnesses E. R. Kinsey and Joseph L. Loida. Defendant offered to prove by Kinsey "that had the street widening paving been done by the city the tax bill against this property would have been between twelve and fifteen hundred dollars." As appears, the measure of damages was the difference in market value before and after the subway construction. The market value could only be affected by what *is* and

696

not by what *might have been*. The offer was properly refused. Without going into detail we think it is sufficient to say that the offer as to the witness Loida was properly refused for the same reason.

In the situation, we do not rule the assignment on an alleged excessive verdict. The judgment should be reversed and the cause remanded and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.