ALTO BOLINO, Administrator of the Estate of FRED BOLINO, Deceased, v. ILLINOIS TERMINAL RAILROAD COMPANY, Appellant.—No. 40078. —200 S. W. (2d) 352.

Division One, March 10, 1947.

*Roscoe Anderson* and *Cullen Coil* for appellant; *Anderson, Gilbert, Wolfort, Allen & Bierman* of counsel.

1238

*Louis E. Miller* and *Miller & Landau* and *B. Sherman Landau* for respondent.

BRADLEY, C.—Action under the Federal Employers' Liability Act (45 U. S. C. A., Sec. 53 et seq.) to recover damages because of the death of Fred Bolino, an employee of defendant. The suit was brought by the administrator (the father) of deceased for the benefit of the father and mother.

The petition was in two counts and alleged general negligence (res ipsa). The first count asked for damages in the sum of $15,000 for conscious pain and suffering, and the second count asked for $85,000 for the pecuniary loss. So far as concerned here the answer was a general denial. The jury found for defendant on the first count and for plaintiff on the second count in the sum of $13,500. Judgment went accordingly and defendant appealed.

Defendant (appellant) assigns error on the refusal of its requested instructions B, D, and G; on the giving of instruction .6; on modified instruction 4; and an alleged excessive verdict.

Deceased, 33 years old, was the unmarried son of plaintiff administrator and his wife, Frederica, and was killed in the derailment of a pushcar drawn by a motorcar about 9 A. M. on December 29, 1945, about three-quarters of a mile north of Wood River, Illinois, and it is conceded that, at the time, deceased and defendant were engaged in the furtherance of interstate commerce. Deceased was a bond welder and at the time of the derailment, he and his welding helper, Lewis Votrain, were riding on the pushcar. The motorcar was operated by defendant's section foreman, Val Gilbreath, and all were on their way to a previously designated point on the track where a bond or bonds were to be welded on.

Cecil Rowlands was a welder and deceased was under Rowlands. Prior to December 29th Rowlands had directed deceased to replace bonds where necessary on the track where the derailment occurred. Ordinarily the welders used their own truck to carry welding equipment and to get to the places where bonds were to be welded, but sometimes a truck could not get sufficiently near to some of the places, and that seems to have been the situation December 29th. Anyway, on December 29th, defendant's roadmaster, C. E. Winkler, directed Gilbreath to use the motorcar and pushcar and take deceased and his helper, with their welding equipment, to the places where bond welding was to be done, and Gilbreath did so.

Bonds are woven strands of small copper wire; are round and are from one half inch to one inch in diameter, and vary in length from 8 inches to 30 inches. Over each end, for welding purposes, is a triangular and flat like piece of solid copper some 3 inches in length. The bonds are welded to the rail ends, on the outside, and transmit electric current from one rail to the next. The pushcar was coupled to the motorcar by a round iron coupling rod about $1\frac{1}{4}$ inches in diameter and about 4 or 5 feet in length. The coupling rod at the ends separated into a flat clevis-like shape with round holes therein for coupling pins. On the motorcar and on the pushcar was a metal flange-like attachment containing round holes over which flange-like piece the clevis-like ends of the coupling rod were placed so as to accommodate the coupling pins. Ordinary rail spikes, without cotter keys, were used for coupling pins both at the motorcar and at the pushcar.

The motorcar was 5 or 6 feet in width and 7 or 8 feet in length; about $2\frac{1}{2}$ or 3 feet in height; had wood floor; no guard boards were at sides or ends. There were two holes in the floor, one at the left rear and one about the "middle of the rear" and about 2 feet from the rear. These holes were about 2 to 8 inches in width and about 18 inches in length. The three men, Gilbreath, section foreman and

motorcar operator, deceased, and his helper Votrain, started out the morning of the derailment from Hartford, Illinois, south of the place of derailment, and the bonding equipment was loaded on the pushcar at Hartford. Gilbreath had 3 empty oil barrels or drums, 2 fifty gallons and one 30 gallons, that he wanted to refill at Federal, north of Hartford, and these were loaded upright across the front end of the pushcar, one at each corner and one between. A piece of welding equipment, termed a resistor, 16 to 18 inches in width and about 2 feet in length, was loaded near the left rear. Other welding equipment consisting of welding rods, welding pins, poles, and 25 or 30 welding bonds, placed crosswise, were loaded between the resistor and the barrels; the welding helper said "right behind the barrels in that pocket." Deceased, at the time of the derailment, was riding in a squatting position with a hand on a barrel on the right hand side of the pushcar. Votrain was standing directly behind deceased. The motorcar and pushcar were traveling 15 or 20 miles per hour. The track was dry, straight and level, except for some slight unevenness.

Votrain, welder helper, testified: "The first I knew there was going to be an accident, there was just a sudden stop. I was thrown in the air; a barrel hit me on the side of the face and the next thing I knew I was off the pushcar on the right hand side. Q. Where were you lying with reference to where the pushcar was after the accident? A. I would say a little bit to the north and on the east side of the track. Q. On the east side of the track? A. Yes. Q. A little bit to the north. In other words, the pushcar didn't go as far north as you did, did it? A. No, sir. I did not see how deceased was thrown. The motorcar stopped about 30 feet north of the push-car. I got back to Fred (deceased) as soon as I saw his predicament, and pushed the pushcar back a little bit with my shoulder and held his head up. He was lying crosswise the track, his head (to the west) on the rail." The inference is that Bolino was not conscious when Votrain got to him; he died shortly thereafter.

Plaintiff took Gilbreath's deposition and read the deposition, or a part thereof, in evidence. Defendant called Gilbreath as a witness. From the deposition and from his evidence given at the trial Gilbreath's evidence, so far as necessary here, may be stated as follows: "I was going north about 15 or 20 miles per hour and the first thing that attracted my attention, I either felt a jar or heard a noise or something that caused me to look around, and when I looked around the front wheels of the pushcar were off the rails; they were off to the west, and I immediately threw the motorcar out of gear and applied the brakes. I then looked around a second time and Bolino (deceased) was under the pushcar. I did not see Bolino leave the pushcar, but he was on the pushcar the first time I looked around; he fell in front of the pushcar. When I got to Bolino he was 8 or 10

feet behind the pushcar; had a bad place in the back of his head; all four wheels of the pushcar were then off the track. The two east wheels were against the west rail and the other two were on the outside of the track, west.

"When I first looked back and saw the front wheels of the pushcar off the track, the motorcar was still connected with the pushcar by the coupling rod; and when I looked back the second time it was still so connected; the spike was still in there. But when the motorcar stopped the two cars were not connected. The coupling rod had then come loose from the motorcar. When it came loose from the motorcar it dropped down and caught on the ties; turned back under the pushcar and broke loose from the pushcar; pulled the bolts out of the wood of the pushcar and was then disconnected from both. The coupling rod was bent but very little. From the time I saw the front wheels of the pushcar off the track until the motorcar came to a stop, the motorcar traveled close to 40 feet, and the pushcar traveled about 35 feet."

C. E. Winkler, defendant's roadmaster who directed use of the pushcar and motorcar, and Floyd Johnson, defendant's machinist, about 2 P. M. on the day of the derailment, made an examination of the pushcar and the scene generally. Gilbreath was also present. No defects were found in the track or in the wheel flanges or in the wheel alignments of the pushcar. The "biggest majority" of the equipment that was on the pushcar was on the west side of the track. No marks were found on the rails to indicate where the pushcar left the track, but Winkler said that marks on the ties showed where the wheels "went over the rail"; that these marks extended north 25 or 30 feet, and that the coupling rod was slightly bent. Johnson found a bond midway between the rails and 8 or 10 feet south of the place where the pushcar then rested on the west side of the track. Johnson said that the vibration of the motorcar and pushcar, when traveling over the rails' "rough spots and low spots" would not cause the spikes, resting loosely at the couplings, to work out, but he said that a cotter key "in the bottom of a coupling pin is to secure it in place so it won't work out," and he said that a spike coupling pin would more likely come out from a sudden jar than a pin that had an even, regular diameter.

It is plaintiff's theory that the spike at the motorcar coupling, because of its square-like shape and without a key and resting loosely in round holes and because of vibration, worked out and that the coupling rod thereupon dropped down, caught in the ties and thereby caused the derailment, and Gilbreath said there was some slight unevenness of the rails and that going 15 or 20 miles per hour there would be some bumping and vibration. On the other hand defendant's theory is that the bond found between the rails and in evidence, in some way worked forward on the floor of the pushcar and by the barrel on

the left front and fell over the front end and onto the rail and thereby caused the derailment, and Gilbreath said that such a bond falling on the rail could have caused the derailment. And defendant says that the entire responsibility for the manner of loading on the pushcar the welding equipment, including the bonds, was on deceased.

Defendant's refused instruction B was a sole cause instruction and was based on the hypotheses that deceased had the sole and exclusive control of the loading of the welding equipment on the pushcar, and loaded it or caused it to be loaded with the welding equipment, and that the equipment was loaded in such manner as to permit a welding bond to roll off at the front end and that a bond did so roll off and onto the rail and that the pushcar was thereby derailed, and that such derailment was the proximate cause of the death, and that if deceased, in loading or causing to be loaded the equipment on the pushcar, failed to exercise such care and prudence as an ordinarily careful and prudent person would have used under the same circumstances, then deceased was negligent, and if found that such negligence was the sole cause of the derailment and death and that no negligence of the defendant in any respect, submitted in other instructions, caused or contributed to cause the death, then plaintiff was not entitled to recover and the verdict would be in favor of the defendant.

Plaintiff, in the brief, says that instruction B was properly refused because there was no substantial evidence that the bond found between the rails fell from the pushcar, or caused the derailment, or that deceased had the sole and exclusive control of loading the bonding equipment on the pushcar, or that the loading arrangement of the welding equipment was improper or was other than the customary way, and that the instruction did not hypothesize facts which would negative defendant's negligence in that it failed to require a finding that the bonds could have been arranged on the pushcar in a safer position considering the holes in the floor and the absence of side and end guard boards on the pushcar furnished by defendant.

Gilbreath, operator of the motorcar, in testifying to conditions immediately after the derailment, said that practically all the bonds on the pushcar were thrown off to the west and that those not so thrown were lying on the front end. "Q. Were any of them between the rails that you saw? A. No, I don't think there were; I think they were on the outside. I didn't notice any inside. Q. Was the pushcar tilted in any direction when it came to a stop? A. Well, nothing more than just the slope of the shoulder of the fill there. Q. Well, which direction was it sloping toward? A. To the west. After the derailment, Gilbreath and Votrain moved deceased from the track; moved the pushcar far enough west to furnish clearance for Gilbreath to go back on the motorcar to Wood River to call an ambulance from Alton. The ambulance arrived at about 9:30 A. M.,

about 30 minutes after the derailment. Some employees of the ambulance company came with the ambulance and these, with Gilbreath, who had returned from Wood River, placed deceased in the ambulance.

The bond that Johnson found was in evidence and was left here when the case was argued. It appears to be new, and there is a slight dent about 6 inches from one end. The dent, lengthwise the bond, is about ¾ of an inch in length and about 3/16 of an inch in width. Three of the small copper wires are pressed down slightly and one less slightly, but perceptibly. The bond is about ½ inch in diameter, about 18 inches in length and is easily flexible. There was no evidence at all and no reasonable inference that a bond or bonds worked forward from their crosswise position somewhere behind the barrel on the left front corner of the pushcar. If such occurred, still there is no suggestion as to how the bond got by the barrel to fall over the front end of the pushcar. And assuming, for the purpose, but not deciding, that deceased had exclusive control of loading the welding equipment on the pushcar, still there is no evidence or reasonable inference that the equipment, including the bonds, was loaded in an improper manner or at an unsafe place on the pushcar. Especially is this true when the holes in the floor of the pushcar are taken into consideration. And defendant made no effort to show improper loading on the pushcar, but does suggest that the bonds could have been loaded in the troughs on the motorcar. There was no evidence as to the weight of the pushcar with its load. The only evidence of weight was that the weight of deceased was 230 pounds and that came in evidence in connection with the physical condition, etc. of deceased.

The small dent on the bond would not of itself be sufficient in our opinion to raise the inference that a wheel of the pushcar passed over it, or that this bond was at the place where found when Gilbreath looked over the scene just after the derailment. The ambulance crew had been there and at least another, other than Votrain, the welding helper. Deceased and Votrain were taken away in the ambulance shortly after 9:30, and Gilbreath then walked back to Wood River, leaving no one at the scene. Those next to appear at the scene, so far as shown, were Winkler, Johnson and Gilbreath, around 2 P. M., when the bond was found. We do not think there was any substantial evidence upon which to base defendant's sole cause instruction B; there was no more than mere speculation and conjecture to show that the bond found between the rails was at the place where found when all left the scene or that this bond fell over the front end of the pushcar or that a wheel of the pushcar passed over it and the pushcar thereby derailed, hence instruction B was properly refused. Seimers et al. v. St. Louis Electric Terminal Ry. Co., 348 Mo. 682, 155 S. W. (2d) 130, l. c. 135, and cases there cited.

 Defendant's refused instruction D was a short burden of proof instruction telling the jury that the burden of proof was on plaintiff,

but plaintiff contends that reversible error was not committed by refusing it because two other instructions told the jury that the burden of proof was on plaintiff. Plaintiff's given instruction No. 1 hypothesized the facts under the res ipsa rule. Plaintiff's given instruction No. 2 told the jury that if they found "from the greater weight of the credible evidence" the facts as submitted in instruction No. 1, "then the plaintiff has met and carried the burden of proof required of him under the law and the instructions herein." Instruction No. 3 told the jury that the mere fact that Fred Bolino was killed while employed by defendant, and the mere fact that his administrator had sued to recover for the death, were of themselves no evidence of defendant's negligence "unless the plaintiff by a preponderance of the credible evidence in this case has established negligence on the part of the defendant as detailed and described to you in other instructions given you by the court."

Plaintiff says that to have given defendant's instruction D would have been repetitious on the burden of proof, and therefore would have emphasized that subject, citing Miller v. Williams (Mo. Sup.), 76 S. W. (2d) 355. While plaintiff's instruction No. 2 and instruction No. 3 were not solely on the subject of burden of proof, yet these, and especially plaintiff's instruction No. 2, told the jury that the burden of proof was on plaintiff, and that is all that defendant's refused instruction D did. Sec. 123, Laws 1943, p. 390, new code, provides: "The supreme court, or courts of appeals, shall not reverse the judgment of any court, unless it shall believe that error was committed by such court against the appellant, and materially affecting the merits of the action." We do not think the refusal of instruction D materially affected the merits of the case.

We consider together, for the most part, the assignments on the refusal of defendant's instruction G and on giving plaintiff's instruction No. 6 on the measure of damages. Defendant's refused instruction G would have specifically told the jury that loss of companionship and mental anguish were not elements of damage, and plaintiff so concedes. See Am. R. Co. v. Didricksen, 227 U. S. 145, 33 S. Ct. 224, 57 L. Ed. 456; Truesdale v. Wheelock et al., 335 Mo. 924, 74 S. W. (2d) 585, 1. c. 592. But defendant says that plaintiff's instruction No. 6, without the limitation contained in instruction G, would have permitted ▇▇▇ award for loss of companionship and for mental anguish. Plaintiff denies this. Instruction 6 directed that if the jury found for plaintiff under instruction No. 1, which submitted the facts under the res ipsa rule, and further found for plaintiff on the second count, "then you will award the plaintiff such sum as you may find and believe from the evidence fairly and reasonably represents the cash value, as of the date of Fred Bolino's death, of such future pecuniary benefits as the parents of said Fred Bolino reasonably might have expected to receive from said Fred Bolino if

he had not been killed." Then the instruction goes on to tell the jury that in arriving at the amount awarded they might take into consideration the age, health, earning power, etc. of deceased, and among the things mentioned were the "care, attention and assistance" that the parents might reasonably have expected from deceased. It is this "care, attention and assistance" that defendant says authorized award for loss of companionship and for mental anguish.

Jenkins v. Wabash Ry. Co., 232 Mo. App. 438, 107 S. W. (2d) 204, was under the Federal Employers' Liability Act to recover for the death of a son of the plaintiff. The instruction on the measure of damages was, in effect, the same as here. There the instruction was phrased, so far as pertinent to the point here, "services, care, and attention", instead of "care, attention and assistance" as here. One of the complaints on the instruction in the Jenkins case was that "it failed to limit the finding to the pecuniary loss sustained." The instruction was approved by the court of appeals and certiorari was denied. See Wabash R. Co. v. Jenkins, 302 U. S. 737, 58 S. Ct. 139, 82 L. Ed. 570. The argument to the jury in the present case is in the record, and in argument able counsel for defendant, in discussing damages, made it plain that "under the instructions of the court" the parents were not entitled to recover anything "for their grief or their sorrow." In view of plaintiff's instruction No. 6, on the measure of damages, defendant's instruction G was no more than a cautionary instruction which was for the court's sound discretion. Lewis v. Zagata, 350 Mo. 446, 166 S. W. (2d) 541, 1. c. 544, and cases there cited; Morris v. E. I. DuPont DeNemours & Co. et al., 351 Mo. 479, 173 S. W. (2d) 39, 1. c. 42. We do not think that there was error in instruction No. 6 in the respects above mentioned, or in refusing defendant's instruction G.

█ Also, defendant makes a point on plaintiff's instruction No. 6, which point does not concern instruction G. Defendant says that instruction 6 is bad because it permitted the jury to consider the health of the mother of deceased when there was no evidence as to her health. The mother was not a witness and not before the jury as such, and defendant says that such being so and absent evidence as to her health, "the jury had no way of determining her health." It is true that the mother was not a witness and that there was no evidence as to her health, but it would appear from the record that she was in the court room at least during argument, and counsel for plaintiff, in the brief, say that "the parents were present in court throughout the trial, subject to the full view of the jury." In argument, preserved in the record, counsel for plaintiff said, " . . . that man and that woman who sit back there, mother and father of deceased . . ." We do not think that absence of evidence as to the mother's health is sufficient, in the situation here, to justify a

reversal. We here again make reference to Sec. 123, supra, of the new code.

■ Was error committed in giving modified instruction 4? Defendant requested instruction A, as follows: "The court instructs you that although you may find that Fred Bolino's death was directly caused by or contributed to by the negligence of the defendant yet, unless you further find and believe from the evidence that Alto Bolino and Frederica Bolino, the father and mother of Fred Bolino, or either of them, have sustained a loss of pecuniary benefits as the result of the death of Fred Bolino, your verdict will be in favor of the defendant as to count 2 of plaintiff's petition."

The court modified instruction A and gave it as No. 4. As modified it reads as follows: "The court instructs you that although ■ you may find that Fred Bolino's death was directly caused by or contributed to by the negligence of the defendant yet, *unless you further find* and believe from the evidence that Alto Bolino and Frederica Bolino, the father and mother of Fred Bolino, or either of them, have sustained a loss of such future pecuniary benefits *as they reasonably might have expected* to receive from said Fred Bolino if he had not been killed, your verdict will be in favor of the defendant as to count 2 of plaintiff's petition" (italics ours).

Defendant says that the modified instruction assumes that the parents might reasonably have expected future pecuniary benefits from the deceased had he not been killed. Instruction No. 6, on the measure of damages, as appears, supra, clearly required a finding as to the reasonable expectancy of the parents as to future pecuniary benefits, and when modified instruction 4 is fairly read, we think the italicized *as they reasonably might have expected* may be considered as hypothesized under *unless you further find*. See Dohring v. Kansas City (Mo. Sup.), 81 S. W. (2d) 943. Anyway, when modified instruction No. 4 is read in connection with No. 6, there could be no reasonable liklihood that the jury got the notion that the court meant to tell them that they could assume, take it for granted as defendant says, that the parents might reasonably have expected future pecuniary benefits. We do not think error was committed by the modification complained of.

■ Is the verdict excessive? As appears, supra, the verdict was for $13,500, and that the deceased was 33 years of age at the time of his death. The father and mother were 60 and 62 respectively. The expectancy of the deceased was 32.36 years and that of the father and mother 13.31 and 14.34 years respectively. The pay of deceased at the time of his death was $8.00 per day and his gross earnings in 1945, up to the his death December 29th, were $2,338.10. Defendant in the brief says: "It is inconceivable to us how a father and mother whose average life expectancy is 13.83 years, and who under the evidence most favorable to respondent could expect to

receive only $80.00 a month, could sustain a pecuniary loss by reason of the death of the son in excess of $6,000.00.''

On the basis of $80 per month and up to the end of the mother's expectancy, 13.31 years, $11,777.60 would have been contributed. The father's expectancy was 1.03 years more than the mother's. If he received the contributions for the 1.03 years on the basis of $80 per month, the sum would be $988.80, or if he received only the half thereof after the expiration of the mother's expectancy, the sum would be $480. The $11,777.60, and the $988.80 make $12,737.60, or figured on the half of the $988.80, the sum would be $12,257.60. Deceased did not live in the home of his father and mother, but after his day's work as a welder for defendant, he helped, about 2 hours per day, in doing the work about the father's farm; plowed, helped feed the horses, cattle, sheep and hogs. These services were of pecuniary value. Illinois Central R. Co. v. Humphries, 174 Miss. 459, 164 So. 22, 102 A. L. R. 549.

Counsel say that the father was financially comfortable and that deceased was to be married, and therefore, the parents could not reasonably have expected, had deceased not been killed, to have received any such sum for pecuniary loss as the jury awarded. The evidence about marriage was by the undertaker who conducted the funeral of deceased. A woman, he said, told him that she and deceased had intended to be married shortly. Counsel for plaintiff moved to strike this, but the court did not rule because counsel for plaintiff said, ''Go ahead.'' This and the evidence of the father's financial condition were before the jury. The amount of damages is primarily the jury's prerogative. Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S. W. (2d) 568, l. c. 577, 161 A. L. R. 383. Counsel cite no case and we find none satisfactorily comparable to the situation here, but considering the present depreciated purchasing power of money [Francis v. Terminal R. Assn., 354 Mo. 1239, 193 S. W. (2d) 909, l. c. 914] we do not believe that we should hold that the verdict is excessive.

The judgment should be affirmed and it is so ordered. █ *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.